**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Michael Tighe, being duly sworn, depose and state that:

**INTRODUCTION**

1.       I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – an Android Version 11, Model # B131DL with phone number (269) 486-9146, further identified as Michigan State Police (MSP) evidence number AICS # 13 under MSP case number SWE-0000081-23, as described in Attachment A (**Subject Device #1**), a black Apple IPhone in a black case further identified as MSP evidence number AICS # 14 under MSP case number SWE-0000081-23, as described in Attachment A (**Subject Device #2**), and a black Samsung with a cracked screen in a black case with phone number (269) 210-1133, further identified as MSP evidence number AICS # 15 under MSP case number SWE-0000081-23, as described in Attachment A (**Subject Device #3**)  - that is currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2.       I am a Drug Enforcement Administration (DEA) Special Agent, United States Department of Justice. I am currently assigned to the Kalamazoo Post of Duty in the DEA's Detroit Field Division. I have been employed with the DEA since January 2005. During my time as a Special Agent, I have lead and/or participated in multiple investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug

records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of drug proceeds, and the dialect, lingo, and coded language used by drug traffickers. As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963, as well as Title 18, United States Code, Sections 1956, and 1957. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3.     I respectfully submit that there is probable cause to believe that Kendall HOLLINS has engaged in the possession with intent to distribute, crystal methamphetamine and fentanyl, and that he has conspired to do the same, in violation of 21 U.S.C §§ 841(a)(1), 846. I further submit that there is probable cause to believe that evidence of this offense will be found on **Subject Device #1, Subject Device #2, and Subject Device #3**.

4.     The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses.  This continuation is intended to show merely that

there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. **Subject Device #1, Subject Device #2, and Subject Device #3** are currently logged into Michigan State Police (MSP) Southwest Enforcement Team (SWET) evidence, however, the **Subject Devices** are currently stored at the Berrien County Sheriff Office in St. Joseph, Michigan. The applied-for warrant would authorize the forensic examination of **Subject Device #1, Subject Device #2, and Subject Device #3** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. In early February 2021, a confidential source (hereinafter CS - 1[1]) provided information regarding the controlled substance distribution activities of Kendall HOLLINS. CS-1 described HOLLINS as a tall and skinny black male, who used the street name of "Vito." CS-1 was shown a Michigan Secretary of State

---

[1] CS-1 began working with the Michigan State Police (MSP) Southwest Enforcement Team (SWET) in January 2021. CS-1 has worked with the MSP SWET team for approximately three months. During the time CS-1 worked with MSP SWET, CS-1 conducted controlled purchase of drugs with MSP SWET and additionally provided several pieces of information to MSP SWET concerning multiple other drug dealers in the Berrien County Michigan area. At no time has any of the information CS-1 provided to MSP SWET been determined to be false or misleading. CS-1 was working off charges while working for MSP SWET. CS-1 has criminal convictions for 2005 - Controlled substance -DEL/MFG (cocaine, heroin or another narcotic) less than 50 grams; 2006 Controlled substance -DEL/MFG (cocaine, heroin or another narcotic) less than 50 grams; 2008 - Controlled substance -DEL/MFG (cocaine, heroin or another narcotic) less than 50 grams; 2016 - Controlled substance -DEL/MFG (cocaine, heroin or another narcotic) less than 25 grams; 2017 – firearms – possession by felon; and 2021 -  Controlled substance -DEL/MFG (cocaine, heroin or another narcotic) less than 50 grams.

photograph of HOLLINS and CS-1 positively identified the person in the photograph as "Vito" (hereinafter HOLLINS). CS-1 told investigators, he/she could purchase ounce quantities of methamphetamine from HOLLINS.

7.      On February 3, 2021, investigators met with a CS-1 to conduct a controlled purchase operation. CS-1 was searched for contraband, weapons, or money, prior to the controlled purchase. Nothing was discovered on CS-1. CS-1 was provided with pre-recorded buy money from MSP SWET. In the presence of investigators, CS-1 contacted HOLLINS and negotiated an ounce quantity crystal methamphetamine purchase. A meet location was established by CS-1 and HOLLINS. Investigators conducted surveillance of the controlled purchase. Investigators observed CS-1 meet with a black male in a silver Chevrolet Tahoe. This transaction lasted approximately one minute. Investigators observed the black male leave in a vehicle (Chevy Tahoe) which was identified as having an Illinois license plate number BG65307. Investigators contacted CS-1 shortly after the controlled purchase. CS-1 provided Investigators with approximately 29 grams of suspected methamphetamine, which field tested positive for the presence of methamphetamine. CS-1 stated he/she purchased the methamphetamine from HOLLINS. The Chevrolet Tahoe was surveilled from the controlled purchase back to the area near 404 Thurgood Avenue, Benton Harbor, Michigan 49022.

8.      Investigators queried the Illinois license plate BG65307 and identified the Chevy Tahoe as a rental vehicle belonging to PV Holdings. Investigators obtained information that this vehicle was rented at the time of the controlled purchase by

Kendall HOLLINS with an associated address of 1178 Circle Drive, Benton Harbor, Michigan 49022

9.      Investigators again spoke with CS-1 regarding HOLLINS and his criminal drug trafficking activities. CS-1 advised HOLLINS lived at the apartments off Thurgood Avenue within the City of Benton Harbor, Michigan. CS-1 stated HOLLINS was currently living with a female with the first name of Kenyatta. Investigators were familiar with the known residence of HOLLINS being 404 Thurgood Avenue, Benton Harbor, Michigan, which was where HOLLINS lived with his girlfriend, Kenyatta Osby. CS-1 further stated CS-1 believes HOLLINS was selling drugs from a different location from where he lives at in in the Thurgood Apartments. CS-1 described this location to investigators as being somewhere in the "Heights" which investigators were familiar with as being in the North Benton Township area. CS-1 further advised this location as being somewhere off Territorial Road.

10.      Throughout the investigation, investigators conducted surveillance on HOLLINS and his associated vehicles. Investigators established a location that HOLLINS frequented quite often was identified at that time (early 2021) as Sparkle U-Stor-It storage units located at 1085 Nickerson Court, Benton Harbor, Michigan 49022. Currently, investigators learned that Sparkle U-Stor-It had changed names to Fairplain Self Storage (hereinafter Fairplain Self Storage) and is still located at 1085 Nickerson Court, Benton Harbor, Michigan.

11.    During the early part of 2021, while investigators were conducting surveillance on HOLLINS, it was viewed that HOLLINS went to the Fairplain Self Storage units on almost a daily basis and sometimes up to several times a day. Many of the visits HOLLINS made to the Fairplain Store units were shorter visits, not lasting more than 5-10 minutes at a time.

12.    In March of 2021, investigators obtained an Administrative Subpoena for the storage Units that HOLLINS had been going to. Fairplain Self Storage management provided documents that indicated Kendall HOLLINS had rented units #455 and #456 at their 1085 Nickerson Court, Benton Harbor, Michigan facility.

13.    On March 16, 2021, investigators, Deputy (Dep.) Haskins with the Berrien County Sheriff Office (BCSO) with his K-9 partner "Mika" conducted an open air search of the Fairplain Self Storage facility. Dep. Haskins and K-9 Mika conducted an open-air search specifically at storage unit numbers #455 and #456. BCSO K-9 Mika alerted to the presence of drugs at both of HOLLINS rented storage units.[2]

---

[2] Berrien County Sheriff Office detection canine "Mika" is trained to alert to the odor of controlled substances. These substances include cocaine, crack cocaine, heroin, and methamphetamine. Upon locating one of these four controlled substances, "Mika" is trained to sit with a head lock on the source of the odor. This is called a "passive alert: This alert may also indicate items recently contaminated with the odor of one or more of the controlled substances. K-9 "Mika" received her training in narcotics detection at Vohne Liche Kennels in Denver, Indiana. "Mika" was certified in the detection of narcotics in August 2018. Since that time, training has continued on a weekly basis with his handler Deputy Haskins of the Berrien County Sheriff's Department, who has been a certified police officer in the State of Michigan since January 2003. Since K-9 "Mika's" certification, K-9 "Mika" has continued training and has been recertified training in narcotics detection at Vohne

14.     On March 9, 2023, investigators spoke with an MSP CS (hereinafter CS-2[3]). CS-2 was shown a Michigan Secretary of State photograph of Kendall HOLLINS and CS-2 positively identified the subject in the photograph as "Vito." CS-2 advised that HOLLINS lived at 404 Thurgood Avenue, Benton Harbor, Michigan, with a black female. CS-2 has personal knowledge that HOLLINS has been selling several different types of drugs in the Benton Harbor area of Michigan for approximately the last seven to ten years. CS-2 told investigators, HOLLINS was still selling drugs to this day. CS-2 stated HOLLINS was known for selling large amounts of crystal methamphetamine as well as crack cocaine and heroin / fentanyl.

15.     On March 12, 2023, investigators conducted a controlled purchase of crystal methamphetamine from HOLLINS utilizing CS-2. Prior to the controlled

---

Liche Kennels and has received re-certification in the detection of drugs in July 2019. In July 2020, K-9 "Mika" was certified through the North American Police Work Dog Association (NAPWDA) for narcotics detection of cocaine, crack cocaine, heroin, and methamphetamine.

[3] CS-2 began working with the MSP SWET in November 2022. CS-2 has worked with the MSP SWET for approximately 3-5 months. During the time CS-2 worked with MSP SWET, CS-2 has conducted several controlled purchases of drugs and provided several pieces of information to MSP SWET concerning multiple other drug dealers in the Berrien County, Michigan area. At no time has any information CS-2 provided to MSP SWET been determined to be false or misleading. CS-2 was being paid while working for MSP SWET. CS-2 has criminal convictions for 1999 – B & E; 2002 – Police Officer – Fleeing – 3rd Degree; 2007 – Retail Fraud – 3rd Degree; 2008 – Larceny –less than $200; 2008 – Police Officer – assaulting/resisting/obstructing; 2008 – Retail fraud – 3rd degree; 2009 – Retail fraud – 1st Degree and Habitual offender; 2010 – Retail fraud – 2nd degree; 2011 – Receiving stolen property – more than $1000; 2013 – Retail fraud – 3rd degree; 2013 – Larceny – over $200 but less than $1,000; 2014 – Retail fraud – 1st degree; 2018 – Retail fraud – 2nd degree; 2019 – Malicious destructing of building – less than $200, retail fraud – 2nd degree, and assault and battery; 2019 – Domestic violence; 2020 – Controlled substance – DEL/MFG (cocaine, heroin or anther narcotic) less than 50 grams; 2022 – Furnishing contraband to prisoners;

purchase investigators met CS-2 and CS-2 was searched for contraband, weapons, or money. Investigators discovered nothing on CS-2. CS-2 advised investigators that CS-2 could purchase crystal methamphetamine from HOLLINS. Investigators were present with CS-2 when CS-2 placed a phone call to HOLLINS. HOLLINS telephone number was identified as (269) 210-1133 (hereinafter **Subject Device #3**). Investigators overheard this conversation and heard a male voice on the other end of the phone conversation agree to the sell CS-2 methamphetamine. HOLLINS then told CS-2 to meet him (HOLLINS) "on Thurgood." Investigators provided CS-2 with pre-recorded MSP buy funds to purchase the methamphetamine. Investigators conducted surveillance of CS-2 to the location where CS-2 parked, which was near Thurgood Avenue. A short time later, investigators observed a white SUV crossover style vehicle leave the area in front of 404 Thurgood Avenue. Investigators observed the driver of the white SUV meet with CS-2 for a short amount of time. Immediately following this interaction, CS-2 called investigators and stated he/she had just purchased methamphetamine from HOLLINS. Investigators followed CS-2 to a pre-determined location and CS-2 handed investigators a clear plastic bag containing a quantity of suspected methamphetamine, which later field tested positive for the presence of methamphetamine. During the debriefing of CS-2, CS-2 stated he/she had given HOLLINS the pre-recorded buy funds in exchange for the methamphetamine. CS-2 further identified HOLLINS as the subject that sold the methamphetamine. CS-2 was again checked by investigators for any additional illegal contraband, and none was located.

16.     On March 15, 2023, investigators issued another Administrative Subpoena to Fairplain Self Storage for updated information regarding storage units #455 and #456, as well as any security footage of HOLLINS while at the storage facility. Fairplain Self Storage management provided the following information, Kendall HOLLINS, date of birth 9/6/1982, was still the renter of storage units #455 and #456 and his listed address was 1178 Circle Drive, Benton Harbor, Michigan 49022. HOLLINS has utilizes the Circle Drive address in the past as an address of record for rental vehicle he has rented in the past and is the listed address with the Michigan Secretary of State for his Driver License.

17.     On March 17, 2023, investigators were contacted by CS-2 regarding HOLLINS location and the vehicle HOLLINS was currently driving. CS-2 stated HOLLINS was at 404 Thurgood Avenue, Benton Harbor, Michigan and his white GMC SUV was parked at the residence. Investigators drove past 404 Thurgood Avenue and observed a white GMC SUV style vehicle backed up to the white garage door that was attached to and next to the green entry door that had the numbers "404" affixed above the door. CS-2 further confirmed that HOLLINS was still residing at 404 Thurgood Avenue.

18.     On March 18, 2023, CS-2 provided Michigan license plate number DRV753 as the license plate number for the white GMC SUV HOLLINS was driving. Investigators queried the license plate number provided by CS-2 with the Michigan Secretary of State and discovered the license plate was registered to a 2020 GMC Terrain to Kenyatta Licole Osby at 404 Thurgood Avenue, Benton Harbor, Michigan 49022.

19.     On March 18, 2023, investigators, BCSO Deputy Grimm, and his K-9 partner "Thor" conducted an open-air search at Fairplain Self Storage units #455 and #456. The storage units are located at 1085 Nickerson Court, Benton Harbor, Michigan 49022. BCSO K-9 "Thor" alerted to the presence of drugs at HOLLINS storage unit #456.[4]

20.     On March 21, 2023, investigators obtained State of Michigan search warrants for HOLLINS residence at 404 Thurgood Avenue, Benton Harbor, Michigan 49022, and for storage units #455 and #456 at the Fairplain Self Storage.

21.     On March 22, 2023, investigators executed the search warrants at storage units #455 and #456. During the search of unit #455, a 1999 Chevrolet Corvette was discovered. Inside of the Corvette, investigators discovered an American Tactical .223 rifle registered as a pistol, a Glock pistol micro conversion kit. It should be noted that HOLLINS is a convicted felon and prohibited from possessing any firearms. During the search of unit #456, investigators discovered two digital scales with residue; two partial boxes of 9mm ammunition; a loaded

---

[4] Berrien County Sheriff Office detection canine "Thor" is trained to alert to the odor of controlled substances. These substances include cocaine, crack cocaine, heroin, and methamphetamine. Upon locating one of these four controlled substances, "Thor" is trained to sit with a head lock on the source of the odor. This is called a "passive alert: This alert may also indicate items recently contaminated with the odor of one or more of the controlled substances. K-9 "Thor" received his training in narcotics detection at FMK9 in Berrien Springs, Michigan. "Thor" was certified in the detection of narcotics in April 2022. Since that time, training has continued on a weekly basis with his handler Deputy Matthew Grimm of the Berrien County Sheriff's Department, who is a certified police officer in the State of Michigan. In April 2022, K-9 "Thor" was certified through the International Police Work Dog Association (IPWDA) for narcotics detection of cocaine, crack cocaine heroin, and methamphetamine.

Glock 26 9mm; 211 grams of suspected methamphetamine, which field tested positive for the presence of methamphetamine; 91.8 grams of suspected fentanyl, which tested positive for the presence of fentanyl; and a package with a UPS shipping label with the sender name Kendall HOLLINS printed on it.

22.     Also on March 22, 2023, investigators and a Benton Harbor Public Safety Officer conducted a traffic stop on HOLLINS while driving the previously described 2020 white GMC Terrain. HOLLINS was taken into custody without any issues. A search of HOLLINS revealed two cellular phones (Subject Device #1 and Subject Device #3), a set of keys with two keys that each fit into the locks at the storage units #455 and #456, and $1483.00 in U.S. Currency.

23.     The final search warrant was executed, on March 22, 2023, at 404 Thurgood Avenue, Benton Harbor, Michigan 49022. During the search of 404 Thurgood, investigators discovered a digital scale with suspected fentanyl residue in the downstairs bedroom and a loaded Springfield XD-9 9mm handgun.

24.     HOLLINS was read his Miranda rights and HOLLINS agreed to talk to law enforcement. Investigators audio recorded the interview of HOLLINS. During the interview, HOLLINS indicated the handgun located in the 404 Thurgood residence was his and that he had purchased the handgun for a few hundred dollars on the street "so long ago." HOLLINS went on to say, he had purchased the handgun for protection. HOLLINS stated he was staying in the down stairs bedroom area where the handgun and scale were found. HOLLINS stated he had not worked in a year and a half or two years, but had been trying to find work. HOLLINS stated the

last time he worked was at the Benton Harbor High School as a custodian. HOLLINS was asked about the storage units at Fairplain Self Storage and HOLLINS asked for an attorney. The interview was terminated at that time.

25.     Investigators then searched the white 2020 GMC Terrain that HOLLINS had been driving and was the sole occupant of. Investigators discovered another cellular telephone (**Subject Device #2**) and that phone was seized.

26.     Based on my training and experience, I know that electronic devices such as the **Subject Devices**, can be used to store electronic information for long periods of times, including years. Even if a drug trafficker is being cautious of law enforcement detection and deleting the substance of communications, significant data may still remain on the phone, such as call logs, contact information, photographs, wireless internet connections (which can reveal location information), and other location information. Furthermore, I know that drug traffickers carry and utilize multiple phones to conduct criminal drug transactions.

27.     Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

  a.     Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

  b.     Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and

voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

b.    Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

c.    That drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business;

d.    Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

e.    User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

f.    Drug traffickers often use the internet to look up various information to support their drug trafficking activities;

g.    That drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns.  Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming

from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

h.     That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers.  These and other items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control.

i.      That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

j.      That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

k.      That it is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

l.      That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

m.      That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by

the Internal Revenue Service or other federal, state, or local agencies.  The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

n.  That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o.  That drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service.

## TECHNICAL TERMS

28.  Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of

capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some

portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some

computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.     Based on my training, experience, and research, I know that the **Subject Devices** have the capability to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

31.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use,

who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

- Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

- A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

- The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

- Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34.    I submit that this continuation supports probable cause for a search warrant authorizing the examination of **Subject Devices** described in Attachment A to seek the items described in Attachment B.